PHILLIP J. BORN, APPELLANT, V. AUGUST KEIL, APPELLEE.

22 N. W. 2d 175

FILED MARCH 15, 1946. No. 31972.

*Walter H. Smith* and *Perry, Van Pelt & Marti*, for appellant.

*J. Howard Davis* and *Wm. R. Patrick*, for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CARTER, J.

This is a suit to enjoin the defendant from maintaining a ditch and dike upon his premises, which carried the waters of a natural watercourse from his land onto plaintiff's land. The defendant denied generally the allegations of plaintiff's petition and cross-petitioned for a mandatory injunction requiring the plaintiff to remove certain dikes and barricades constructed by the plaintiff in defending his land from the waters carried in the ditch in controversy. The trial court held against the plaintiff and he appeals.

The record shows that plaintiff was the owner of Lot 9

and the SW¼ SE¼ of Section 36, and other lands. The defendant was the owner of Lot 8, which lay immediately north of Lot 9. There was a highway running east and west between Lots 8 and 9. At a point 467 feet west of the southeast corner of Lot 8 there was a highway bridge, 16 feet long and 16 feet wide. The natural watercourse herein referred to as East Creek passed under this bridge and crossed onto Lot 8. It then turned east along the north side of the highway through the ditch in controversy to the southeast corner of Lot 8. At this point it discharged any waters flowing in the ditch upon the lands of the plaintiff described as SW¼ SE¼ of Section 36. For convenience, a plat showing the immediate area and certain facts testified to in the evidence is hereafter shown.

This plat is not the reproduction of any single exhibit in the record. It is very similar to plaintiff's Exhibit No. 1 which was admitted in evidence without objection being made thereto.

The evidence shows that East Creek originates a mile and one-half or two miles south of the highway bridge. Springs supply the water found at its source. The evidence is in conflict as to the amount of natural flow carried in East Creek, although all witnesses agree that surface waters increase its flowage after rains and at times cause it to overflow its banks. It varies in width from 8 to 30 feet. Its depth varies from 5 to 15 feet. Its banks are clearly defined. It is clear from the record that East Creek is a natural watercourse from its source to the highway bridge, which has existed during the memory of all who are familiar with it.

The plaintiff testifies that he has lived near this land and known it all his life, he being 70 years of age. His testimony is that East Creek continued on straight north from the highway bridge for at least 80 rods and then turned in a northeasterly direction towards the railroad bridge shown on the plat. Another witness, Fred Hirz, testifies that he lived in that vicinity from the time he was born in 1891 until 1912, and that East Creek continued on north from the highway bridge for a quarter of a mile or more. In 1941 or 1942, he was again at the highway bridge and found that it no longer continued on north, but turned directly east after crossing the highway under the bridge. Otto Petereit, the plaintiff's son-in-law, testifies that he lived in the community since 1912, and that East Creek continued on north from the bridge and crossed Lots 8, 21, and 20. Several other witnesses who were familiar with East Creek for many years back testified that it continued on north from the highway bridge until very recent years. The defendant pleads in his answer that the water had always flowed east immediately after crossing the highway between Lots 8 and 9 and that said easterly course was the natural watercourse. Both he and his son testify that this was the case. No other

witness corroborates their evidence. We are obliged to say that the evidence clearly preponderates in favor of the plaintiff on this issue.

The record is clear, as shown by the contour lines on exhibits prepared by a qualified engineer, that the land on each side of East Creek slopes to the north. It is just as clear that there is also a similar slope to the east. It is evident that, as East Creek proceeded north from the highway bridge, it ran into a flatter area which caused it to lose velocity and deposit sediment. According to the evidence of plaintiff's engineer, this caused a delta to form in Lot 8. As the deposits of sediment grew, the water began to spread. The slope of the land being to the north and east, the natural course of drainage was to the northeast.

The witness Petereit testifies that in 1917, the water pursued a northeasterly course shown substantially by the broken line marked "1917" on the plat. He testifies also that the defendant, with the aid of a county grader, caused the water to change its course in the subsequent years, shown on the plat by the broken lines indicating the year in which the change was made. His testimony is to the effect that the water was caused to flow more to the east after each change, but that the ditch was always turned north before reaching the west line of the SW¼ SE¼ of Section 36. The defendant denies that he ever changed the course of the water at any time.

The evidence shows, and it is also indicated on the plat along the west line of SW¼ SE¼ of Section 36, that plaintiff constructed several dikes to prevent water from entering his land. The witness Petereit explains that this was to protect against overflow waters resulting after heavy rains and that they were not built to protect against the normal flow of East Creek.

It is urged by the defendant that the natural watercourse of East Creek is from the point where it crosses the south line of Lot 9 in a northeasterly direction to the northeast corner of Lot 9 as shown on the plat by the line marked "Y" to "Y." The evidence is undisputed that East Creek

has run north through Lot 9 for more than ten years. It is also shown that defendant purchased Lot 8 with full knowledge that such was the course of East Creek at that time. While it is evident that there is a well-defined drainage course across Lot 9, substantially as shown on the plat by the line marked "Y" to "Y," it is evident that it drains only the area adjacent to it and any overflow waters that might spill out of East Creek during floodtime. There is no basis for a holding that the natural drainage outlet of all waters approaching the south line of Lot 9 is now to the northeast from that point.

There are other important facts in the record bearing upon the controversy. It appears from the record that the defendant constructed a dike along a portion of the south line of Lot 20 for the purpose of preventing the waters of East Creek from proceeding north, which is designated on the plat by a line marked "1917 Dike." He also constructed a dike along the south line of the NW¼ SE¼, which is shown on the plat by a line marked "X" to "X." The latter dike had the effect of trapping the waters in question on the SW¼ SE¼, such waters being restrained on the north by the dike and on the south by the natural elevation of the land. This brought about the flooding and destruction of the 20 to 30 acres of crops on the SW¼ SE¼ of which plaintiff complains.

It is the contention of the plaintiff that the ditch primarily involved in the present controversy was artificially constructed, while the defendant contends that it is a natural watercourse which has existed substantially in its present location for a great many years. An examination into the evidence pertaining to the nature of this ditch appears to be important.

The record shows that after East Creek passes under the highway bridge it turns sharply to the east and follows the highway in an easterly direction to the lands of the plaintiff in the SW¼ SE¼. Its course from the turn to plaintiff's lands in the SW¼ SE¼ is shown on the plat by the broken line designated "1941." The north side of this drain is

banked, causing the stream to make the turn. It is 40 feet north to the bank from the highway bridge. The bank is about four and one-half feet wide at the level of the ground and two feet higher than the level of the ground. The bottom of the ditch is four or five feet below the top of the north bank. Defendant admits that he caused the east 200 feet of this ditch to be dug out and the dirt piled on the north bank. There is evidence in the record that defendant performed work north of the highway bridge, which brought about the deflection of East Creek to the east. This the defendant denies.

We are convinced from the record that the turn immediately north of the highway bridge was the result of artificial construction and that the record amply demonstrates it. In the first place, East Creek is described as a high velocity stream when it is carrying a substantial head of water. This is confirmed by the size and nature of the sediment which it has deposited in the delta formation on Lot 8. The north bank at the point of the turn, according to the testimony of Roy N. Towl, a reputable hydraulic engineer, has no similarity to any of the deposits of sediment found in the delta to the north and is, in his opinion, an artificially constructed bank. In this respect it is noteworthy that the defendant testifies that the ditch has never carried all the floodwaters passing under the highway bridge. The surplus has escaped to the north by spilling over the embankment to the north and draining away in a northeasterly direction. It hardly seems probable that such a bank could withstand the wash of such overflow waters for the long period of time to which the defendant testifies. The evident velocity of East Creek was such that the turn to the east could not have been the work of nature alone. This statement is confirmed by further expert testimony in the record.

Engineer Towl testifies that he has been over the area herein involved and he testifies to the following facts and opinions: East Creek as it enters Lot 8 with a substantial head of water is a stream of high velocity. When it originally flowed onto Lot 8 it spread or fanned out, lost its

velocity, and dropped its sediment over the area. As time passed, a delta was formed with its base in the neighborhood of the highway bridge. The highest ridge of the delta indicates where the stream once flowed and is indicated on the plat by an "X" in the line shown as "Z" to "Z." He further states that the slope of the ditch indicates that if the flow of East Creek with its floods and high water had not been interrupted, the course of the stream would have continued on north or northeast. In other words, the axis of the delta followed the general drainage slope of the area. That water did enter Lot 20 is convincingly established by the fact that defendant banked against water from the south along the south line of Lot 20 in 1917. An examination was made of the watercourse designated on the plat as West Creek where a similar situation existed. Generally, the topography of that drainage area was the same as in East Creek. A delta was there formed similar to the one involved in the present case. In its development the water in West Creek followed the general drainage course of the area as shown on the plat. It is the opinion of Engineer Towl that East Creek would have pursued the same general course except for the construction of an artificial embankment immediately north of the highway bridge.

There is further proof in the record that East Creek has not flowed east in its present course in the manner and for the time testified to by the defendant. There are several pictures in the record showing the conditions existing at the point where the water enters the SW¼ SE¼. There are also pictures showing this alleged watercourse as it flows over the lands of the plaintiff in that 40 acres. Clearly, they depict no condition indicating that for 40 years or more this ditch has been a natural watercourse. The damage by washing and flooding was clearly of recent origin. The evident force of the water as it entered the SW¼ SE¼ was such that if it had been of long duration, a well-defined watercourse with a much greater carrying capacity would appear on the ground than these pictures show.

We conclude from the evidence that the natural water-

course of East Creek is to the north from the highway bridge and that it now flows east from that point because of the artificial construction hereinbefore described.

East Creek as described in this record is a watercourse. We think, also, that the owner of Lot 9 has acquired an easement against Lot 8 for the purpose of the flow of the waters of East Creek across Lot 8 in its natural drainage course. Bures v. Stephens, 122 Neb. 751, 241 N. W. 542; Central Irrigation District v. Gering Irrigation District, 122 Neb. 199, 240 N. W. 289. Water flowing in a well-defined watercourse cannot be lawfully diverted and cast upon the lands of an adjoining proprietor where it was not wont to run in the course of natural drainage. Kane v. Bowden, 85 Neb. 347, 123 N. W. 94; Keifer v. Stanley, 111 Neb. 822, 198 N. W. 144. Where an obstruction in a natural watercourse constitutes continuing and permanent injury to an adjoining landowner, such landowner may, on a proper showing, obtain a decree ordering the removal of the obstruction. Leaders v. Sarpy County, 134 Neb. 817, 279 N. W. 809. Injunction affords the proper remedy in such a case. Jacobson v. Van Boening, 48 Neb. 80, 66 N. W. 993.

In applying the foregoing principles of law to the evidence before us we are convinced that the plaintiff is entitled to relief. The judgment of the district court is reversed and the cause remanded with directions to enter a decree awarding an injunction as prayed for in plaintiff's petition.

REVERSED.